# MARCELLE HALL, EXECUTRIX (ESTATE OF JULIAN LEON ALTMAN), ET AL. *v.* SHERRY SCHOENWETTER ET AL. (15459)

Callahan, C. J., and Berdon, Norcott, McDonald and Peters, Js.

Argued October 2—officially released December 31, 1996

*Jonathan A. Flatow*, for the appellant (plaintiff).

*Christopher T. Donohue*, for the appellee (named defendant).

CALLAHAN, C. J. The issue in this appeal is whether a finder's fee for the recovery of property paid to the plaintiff, Marcelle Hall, the executrix of the estate of Julian Leon Altman (decedent), by an insurer, Lloyd's of London (Lloyd's), in exchange for the surrender by the plaintiff of a violin possessed by the decedent at the time of his death should be included in his estate or should belong to the plaintiff individually. The plaintiff appeals from a judgment of the trial court that the finder's fee was required to be included in the decedent's estate. We affirm the judgment of the trial court.

This is the saga of the mysterious disappearance of a 1713 Stradivarius violin known as the "Gibson" from Carnegie Hall in 1936 and its reappearance in Bethel after the decedent's death in 1985. Although the long lost Gibson has been recovered, precisely what occurred at Carnegie Hall in 1936 remains clouded by the passage of time and a dying man's death bed equivocation.[1]

The decedent died a resident of Bethel on August 12, 1985, leaving a last will and testament.[2] Thereafter, on October 15, 1985, the plaintiff, the decedent's wife, was appointed executrix of his estate. On May 15, 1986, she filed an Inventory and S-2 Succession Tax Return reflecting estate assets of $39,624.44. The Connecticut

---

[1] See footnote 8.

[2] In his will, the decedent bequeathed certain shares of stock to the plaintiff, divided jewelry between the plaintiff and Sherry Altman Schoenwetter, his daughter, and divided the remainder of the estate equally among the plaintiff, Schoenwetter, and Sylvia Altman, his sister.

department of revenue services issued a certificate of no tax due on June 6, 1986, subject to the case being reopened if additional transfers were discovered.[3] Subsequently, the Bethel Probate Court ordered the plaintiff to file an interim accounting based on complaints made by the defendant, Sherry Altman Schoenwetter, the decedent's daughter and a legatee under his will.[4] The plaintiff filed the interim accounting on February 6, 1991. The defendant objected to the plaintiff's omission from the accounting of a finder's fee in the amount of $263,475.75 received by the plaintiff from Lloyd's in exchange for the violin.

The Bethel Probate Court conducted hearings to determine the validity of the defendant's objection. On the basis of the evidence presented, the court sustained the objection, and ordered the plaintiff to file a new accounting that included the finder's fee and to post a bond in the amount of $300,000. The plaintiff appealed from the Probate Court's judgment to the Superior Court pursuant to General Statutes § 45a-186.[5] After a

[3] Although the Connecticut department of revenue services, inheritance tax division, is a defendant in this action, it submitted no brief in this appeal. References to the defendant in this opinion are to the named defendant Sherry Altman Schoenwetter.

[4] The estate of Sylvia Altman, the decedent's sister, is also a defendant in this action.

[5] General Statutes § 45a-186 provides: "Appeals from probate. Any person aggrieved by any order, denial or decree of a court of probate in any matter, unless otherwise specially provided by law, may appeal therefrom to the superior court for the judicial district in which such court of probate is held, except that any appeal under subsection (b) of section 12-359 or subsection (b) of section 12-367 shall be filed in the judicial district of Hartford-New Britain. Except in the case of an appeal by the state, such person shall give security for costs in the amount of one hundred fifty dollars, which may be paid to the clerk, or a recognizance with surety annexed to the appeal and taken before the clerk or a commissioner of the superior court or a bond substantially in accordance with the bond provided for appeals to the supreme court. Appeals from any decision rendered in any case after a record is made under sections 51-72 and 51-73 shall be on the record and shall not be a trial de novo."

trial,[6] the Superior Court affirmed the Probate Court's judgment and ordered the plaintiff to include the finder's fee plus interest in the decedent's estate. The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).[7]

The Bethel probate judge made findings of fact, which the trial court adopted and supplemented with other findings gleaned from testimony received at trial. Sometime after 1970, the plaintiff began a relationship with the decedent in Washington, D.C. From the beginning of the relationship until his death, the decedent, a professional musician, possessed a violin that he played at recitals, concerts and, more often, at various restaurants and hotels. In 1983, the couple moved to Bethel. They eventually married in 1985, sometime after doctors had diagnosed the decedent as having stomach cancer. The plaintiff made several visits to the decedent, whose health was failing rapidly, at Charlotte-Hungerford Hospital in Torrington where he was receiving treatment. Shortly before he died, the decedent revealed to the plaintiff that the violin he had played throughout his life was actually a famous Stradivarius violin known as the Gibson. The Gibson had been stolen in 1936 from the dressing room of a world renowned violinist named Bronislaw Huberman while Huberman was performing

---

[6] "When entertaining an appeal from an order or decree of a Probate Court, the Superior Court takes the place of and sits as the court of probate." *Kerin* v. *Stangle*, 209 Conn. 260, 264, 550 A.2d 1069 (1988); *Satti* v. *Rago*, 186 Conn. 360, 365, 441 A.2d 615 (1982). In probate appeals, a Superior Court "may admit any evidence that was received by the Probate Court or could have been received by it . . . [but] may not receive evidence that the Probate Court could not have received because it came into existence subsequent to the Probate Court hearing." (Citations omitted.) *Bishop* v. *Bordonaro*, 20 Conn. App. 58, 64, 563 A.2d 1049 (1989).

[7] The plaintiff appeals in her individual capacity and in her capacity as executrix of the decedent's estate.

at Carnegie Hall in New York City. Lloyd's, the insurer of the Gibson, paid Huberman approximately $30,000 to compensate him for the loss of the violin, and thereby acquired title to the instrument. The police never solved the crime.

After the decedent's death, the plaintiff obtained verification that the instrument was indeed the long lost Gibson. She then retained an attorney who negotiated the relinquishment of the violin to Lloyd's, in exchange for which Lloyd's agreed to pay the plaintiff a finder's fee of 25 percent of the net proceeds brought by the sale of the violin. On February 12, 1988, the Gibson was sold for $1,200,000. Thereafter, on February 26, 1988, Lloyd's paid the plaintiff $263,475.75 as a finder's fee.

In response to the defendant's objection to the plaintiff's failure to include the finder's fee in the decedent's estate, the plaintiff claimed that, based on statements made to her by the decedent and newspaper clippings found in the canvass case that housed the violin, it was the decedent who had stolen the violin from Huberman in 1936.[8] The plaintiff argued consequently that, because

---

[8] In her testimony to the trial court, the plaintiff recounted her death bed conversations with the decedent regarding the violin and asserted her belief that the decedent was the thief who stole the violin from Huberman in 1936. During one such conversation, the decedent instructed the plaintiff to look inside the violin case, between the outer shell and the protective canvas cover. Inside the case, the plaintiff found numerous documents, including articles from the New York Times, the New York Evening Post, and the New York Herald Tribune, circa 1936, recounting the theft of the Gibson. In addition, the canvass case contained a September, 1977 edition of The Strad, a journal for players of stringed instruments, in which a portion of an article detailing the theft of the Gibson was highlighted.

After reviewing these materials, the plaintiff returned to the hospital and asked the decedent whether the violin was actually the Gibson, to which the decedent responded affirmatively. The plaintiff testified that when she asked how he obtained the violin, the decedent recited different versions. According to the first version, the decedent bought the violin for $100 from a friend who actually had stolen the violin. According to another version, the decedent actually stole the violin himself. The plaintiff also testified that subsequent conversations with the decedent revealed that the decedent

a thief should not benefit from his crime, neither should his estate. She contended therefore that the finder's fee should not be included among the estate's assets. Although in its memorandum of decision the trial court made no specific finding that the decedent actually had stolen the violin, the court quoted at length from the plaintiff's testimony, in which she asserted that the decedent was in fact the thief, and appeared to proceed on the assumption that the decedent had acquired the violin illegally.[9] The trial court concluded, however, that because the violin, no matter how acquired, had been in the decedent's possession at the time of his death, and because the plaintiff had acquired it in her capacity as executrix, she had a fiduciary duty to include the value of the finder's fee in the decedent's estate.

In her arguments to this court, the plaintiff essentially repeats those made in the trial court. The plaintiff contends that, because the decedent stole the violin, he never acquired good title to the instrument and, therefore, the finder's fee was not an asset of the estate for which the plaintiff was required to account. The plaintiff attempts to distance this case from the hornbook proposition that "possession is itself a protected property right."[10] She argues that she simply did the right thing when she returned the violin to Lloyd's, its rightful owner. We find the plaintiff's arguments unpersuasive.

Initially, we note the unsurprising paucity of case law, both in Connecticut and nationwide, pertinent to the issue before us. To reach our decision, we turn to fundamental concepts of fiduciary responsibility and

and his mother had acted in concert to orchestrate an elaborate plot to steal a valuable violin from a foreign violinist. The decedent's death bed revelations culminated, according to the plaintiff's testimony, with his avowal that he was the actual thief.

[9] The Probate Court made no findings with respect to how the decedent came into possession of the violin.

[10] R. Boyer, Survey of Property (3d Ed. 1981) pp. 683–84.

property law. At all times subsequent to her appointment as executrix, the plaintiff served as a fiduciary for the decedent's estate. See General Statutes § 45a-199 (executrix is fiduciary); see also *Papa* v. *New Haven Federation of Teachers*, 186 Conn. 725, 745 n.15, 444 A.2d 196 (1982) (fiduciary includes relationships such as executor and executrix). An executrix has a fiduciary responsibility "to maintain an undivided loyalty to the estate"; *Ramsdell* v. *Union Trust Co.*, 202 Conn. 57, 65, 519 A.2d 1185 (1987); and must diligently represent "the rights of the heirs and distributees and also those of creditors." *Finnegan* v. *LaFontaine*, 122 Conn. 561, 567, 191 A. 337 (1937). Although executors and administrators are not trustees, they "occupy a position in many respects analogous [to trustees] . . . and many of the rules determining the powers and duties of trustees apply to them." *Hall* v. *Meriden Trust & Safe Deposit Co.*, 103 Conn. 226, 233, 130 A. 157 (1925). "One of the most fundamental duties of the trustee is that he must display throughout the administration of the trust complete loyalty to the interests of the cestui que trust. He must exclude all selfish interest and also all consideration of . . . third persons." (Internal quotation marks omitted.) *Phillips* v. *Moeller*, 148 Conn. 361, 369, 170 A.2d 897 (1961). "A trustee must always be loyal to his trust." *Conway* v. *Emeny*, 139 Conn. 612, 621, 96 A.2d 221 (1953). Similarly, an executrix must remain loyal to the estate that she is administering and must not act out of self-interest or for the interests of parties other than the heirs, distributees, and creditors of the estate.

General Statutes § 45a-341 (a)[11] requires executors and executrices to gather, appraise, and inventory all

---

[11] General Statutes § 45a-341 provides in relevant part: "Inventory to be filed. Property included in inventory. Appraisal. Time limits. Sale of personal property. Hearing. Return of sale. (a) (1) An inventory of all the property of every deceased person and insolvent debtor, except real property situated outside the state, duly appraised, shall be made and sworn to by the fiduciary.

"(2) When any personal property of a deceased person or insolvent debtor is outside of this state the court may receive an inventory of such property,

property of the decedent's estate at the time of his death, except real property located outside the state. Section 45a-341 (a) (3) provides that the inventory of a decedent's estate shall include both tangible and intangible personal property. This court has stated that "[t]he estate of a deceased person consists of property the title to or an interest in which is derived from him . . . ." *American Surety Co. of New York* v. *McMullen*, 129 Conn. 575, 582–83, 30 A.2d 564 (1943). "The inventory of an estate may properly contain any property which may be claimed to have belonged to the deceased when the circumstances are such as to make the matter of his title doubtful, leaving the question of title to be litigated in an ordinary action at law." *Searle* v. *Crampton*, 118 Conn. 42, 46, 170 A. 480 (1934); see also *Lynch* v. *Skelly*, 138 Conn. 376, 378, 85 A.2d 251 (1951).

Under the common law, possession of personal property raises a rebuttable presumption of ownership.[12]

accompanied by such evidence of its value as it deems sufficient and sworn to by the fiduciary.

"(3) The inventory and appraisal of the estate of any deceased nonresident shall include only such interest as the decedent had at the time of his death in the real property and tangible personal property situated in this state and intangible personal property, provided intangible personal property shall not be included if the proceeding in this state with regard to such estate is ancillary to a proceeding in another jurisdiction.

"(4) The fiduciary shall appraise or cause to be appraised such inventoried property at its fair market value.

"(b) (1) The fiduciary shall file the inventory in the court of probate having jurisdiction of the estate of the deceased person or insolvent debtor within two months after the acceptance of the bond or other qualification of the fiduciary. . . ."

[12] The dissent states that "[t]here is no rebuttable presumption of ownership from possession of stolen property belonging to a known owner," citing for authority 73 C.J.S. 237, Property § 36 (b) (1983) and two cases. The dissent then quotes from 73 C.J.S. 237, Property § 36 (b) (1983) for the proposition that the presumption of ownership does not arise when there are ascertained and established facts to the contrary. The dissent, however, omits several sentences from the quote, which reads in its entirety: "The presumption of ownership from possession is true only where the character of the possession is wholly unexplained, and is liable to be overcome by

73 C.J.S. 237, Property § 36 (b) (1983); see *Savannah Bank & Trust Co.* v. *Great American Indemnity Co.*, 303 F.2d 247, 250 (1st Cir. 1962); *Commonwealth* v. *Gildea,* 17 Mass. App. 177, 181, 456 N.E.2d 1157 (1983); *State* v. *Campos,* 61 N.M. 392, 393, 301 P.2d 329 (1956); *People* v. *Florus,* 67 Misc. 2d 809, 812, 325 N.Y.S.2d 127 (1971); *Matter of Estate of Burns,* 585 P.2d 1126, 1130 (Okla. App. 1978). Property in the possession of a decedent at the time of his death is presumptively an asset of his estate. 33 C.J.S. 1083, Executors and Administrators § 125 (1942); see *Hurley* v. *Noone,* 347 Mass. 182, 187–88, 196 N.E.2d 905 (1964) (decedent's possession of currency in safe deposit box established prima facie case of her ownership); *Matter of Buckler,* 227 App. Div. 146, 149, 237 N.Y.S. 242 (1929) (decedent's possession of certain currency before death established prima facie case of her ownership thereof); *Haywood* v. *Kukuchka,* 55 Wyo. 41, 45, 95 P.2d 71 (1939) (decedent's possession of car, along with other indicia of title, established prima

any evidence showing the character of the possession. Thus, if the custody and possession of property are shown to be equally consistent with an outstanding ownership in a third person, no presumption of ownership arises solely from possession. *However, the presumption of ownership arising from possession may not be rebutted by evidence that the property was in a third person, when offered as a defense by one who claims no title and is a wrongdoer.* Presumptions concerning title are never allowable against ascertained and established facts. Thus, a presumption of ownership from possession is not allowable against ascertained and established facts to the contrary." (Emphasis added.) Id.

The above quoted language is another way of stating that a subsequent thief may not defend an action brought by a prior possessor by asserting that the prior possessor never had title to the property in question. See *Russell* v. *Stocking,* 8 Conn. 236, 241–42 (1830); *Goss* v. *Bisset,* 411 S.W.2d 50, 53 (Ky. App. 1967); *Thomsen* v. *State,* 70 Wash. 2d 92, 97–98, 422 P.2d 824 (1966). Although the dissent correctly suggests that the presumption of ownership arising from possession is easily rebutted, the dissent incorrectly assumes that the plaintiff—who never claimed to possess title to the violin in her individual capacity, or to be in privity with Lloyd's, the true owner—had the ability to rebut the presumption. See *Russell* v. *Stocking,* supra, 241–42; *Goss* v. *Bisset,* supra, 53; *Thomsen* v. *State,* supra, 97–98; see also footnote 14 (describing rationale for rule).

facie case of ownership); see also *Hope* v. *Cavallo*, 163 Conn. 576, 581, 316 A.2d 407 (1972) ("[owner] is not a technical term and, thus, is not confined to a person who has the absolute right in a chattel, but also applies to a person who has possession and control thereof"); *Antenucci* v. *Hartford Roman Catholic Diocesan Corp.*, 142 Conn. 349, 355, 114 A.2d 216 (1955) (party in possession of real property regarded as owner except in contest with true title holder); *Chapel-High Corp.* v. *Cavallaro*, 141 Conn. 407, 411, 106 A.2d 720 (1954) (same).

Once the Probate Court appointed the plaintiff executrix of the decedent's estate, the plaintiff undertook a fiduciary duty obligating her to act in the best interests of the estate and the distributees of the decedent's will, which included the defendant and the decedent's sister. Section 45a-341 (a) (1) required the plaintiff to gather and inventory all of the decedent's property so that a proper distribution of his estate might be made. The violin, having been in the possession of the decedent at the time of his death, was an asset of his estate. The plaintiff therefore should have included the finder's fee, the realized value of the violin, in the decedent's estate regardless of whether the decedent had an unassailable title to the instrument during his lifetime. See General Statutes § 45a-341 (a) (1) and (4). Instead of doing so, however, the plaintiff violated her fiduciary duty to act in the best interests of the estate by retaining the finder's fee for herself. Rather than increasing the value of the decedent's estate—which would have benefited the decedent's distributees and creditors, in whose best interests the plaintiff was bound to act—the plaintiff disregarded her fiduciary duty and enriched herself by exchanging a possession of the estate for the finder's fee.[13]

---

[13] In support of her argument that the violin was not an asset of the decedent's estate, the plaintiff asserts that the decedent could not have

The plaintiff's argument that a thief should not benefit from his crime strikes a dissonant note in light of the facts of this case. Although morally compelling in the abstract, the plaintiff's argument is logically inconsistent with her actions since, by negotiating for and accepting the finder's fee on her own behalf, the plaintiff appropriated to herself, in breach of her fiduciary duty, whatever value the violin had to the estate. It has long been a principle of common law that "[t]he party in possession [of property] is regarded by the law as the owner, except in a contest with one who has true title." (Internal quotation marks omitted.) *Antenucci* v. *Hartford Roman Catholic Diocesan Corp.*, supra, 142 Conn. 355; *Chapel-High Corp.* v. *Cavallaro*, supra, 141 Conn. 411; see also *Anderson* v. *Gouldberg*, 51 Minn. 294, 295, 53 N.W. 636 (1892), citing *Armory* v. *Delamirie*, 1 Strange 504, 93 Eng. Rep. 664 (1722). In a suit by a possessor of property against a converter, the converter may not defend by asserting that a third person is the true title holder of the property unless the converter is in privity of title with the third person. See *Russell* v. *Stocking*, 8 Conn. 236, 241–42 (1830); *Goss* v. *Bisset*, 411 S.W.2d 50, 53 (Ky. App. 1967); *Thomsen* v. *State*, 70 Wash. 2d 92, 97–98, 422 P.2d 824 (1966); see also R. Boyer, Survey of Property (3d Ed. 1981) pp. 683–84. The plaintiff had no right or title to the violin except as executrix, and she certainly was not in privity with Lloyd's. The plaintiff attempts to distinguish the present case from those cases holding that the first thief prevails in an action against the second thief by noting that in

secured a finder's fee from Lloyd's during his lifetime and, therefore, that the estate is not entitled to the finder's fee that she negotiated. The plaintiff, however, stands in a different position than would the decedent had he been alive. She is a fiduciary and as such owes an exclusive duty to the estate to inventory, preserve, and account for any tangible or intangible property possessed by the estate. Since the violin, even if its title was doubtful, was a possession of the estate, she was duty bound, if she was to negotiate to obtain value for it, to negotiate on behalf of the estate, not herself.

this case the rightful owner, Lloyd's, eventually received the property. That the rightful owner eventually recovered the stolen property does not change the fact that the plaintiff, in her individual capacity, never had any right whatsoever to the violin. The only possible party that possessed better title than the decedent was Lloyd's. The plaintiff, however, did not accede to the interest of Lloyd's or acquire privity of title with Lloyd's when she misappropriated the violin from the estate.[14]

In sum, the plaintiff as executrix was under a fiduciary duty to act not in her own self-interest, but in the best interests of the estate. She failed to do so and she may not justify the breach of her fiduciary duty in 1988 by virtue of the fact that the decedent may have stolen the violin in 1936. No matter how the Gibson was obtained, it was a possession of the decedent's estate, and once the plaintiff chose to negotiate with Lloyd's for the finder's fee her fiduciary duty required that she negotiate on behalf of the estate, not herself.

The judgment is affirmed.

---

[14] The rationale for the proposition that a converter of property may not defend an action by a prior possessor of the property by asserting that a third person is the true title holder is "the protection of property and the discouragement of breaches of the peace." R. Boyer, supra, p. 684. "It is a generally recognized rule that possession is itself a protected property right. Hence a possessor, whether he be a bailee or even a converter who had stolen the goods himself, may recover for their damage, conversion or theft while in his possession. *As between a possessor and a wrongdoer, possession is a sufficient title, and only one with a superior title may contest the possessor's right.* . . . [The subsequent converter's] conduct is wrongful and should be discouraged, not encouraged. [The subsequent converter] should not be allowed to raise the issue of lack of title in the possessor as this would dilute the law's protection whenever goods were not in the immediate possession of their owner. *[The subsequent converter] can only raise the issue of title when he has a superior one to that of the possessor.*" (Emphasis added.) Id., pp. 683–84. We emphasize that this case does not present a controversy involving the true title owner of the violin, Lloyd's, but rather requires us to determine the rights to the finder's fee for the violin as between a subsequent converter and the legatees of the will of a prior possessor.

In this opinion NORCOTT, MCDONALD and PETERS, Js., concurred.

BERDON, J., dissenting. I cannot agree that a finder's fee[1] paid by the owner of property for the return of that property stolen by the plaintiff's decedent is an asset of the decedent's estate that must be inventoried and accounted for by the plaintiff in her fiduciary capacity as executrix of the decedent's estate. It is undisputed in this case that the Stradivarius violin stolen by the decedent, Julian Altman, was returned after his death to its rightful owner, Lloyd's of London (Lloyd's).[2]

The majority's analysis relies upon three points: (1) the decedent had possession of the violin at the time of his death and the plaintiff, Marcelle Hall, came into possession of it as a result of her fiduciary capacity; (2) the possession raises a rebuttable presumption of ownership under the common law; and (3) based upon that rebuttable presumption, the plaintiff, in her fiduciary capacity, was obligated to inventory the finder's fee she personally received for returning the violin to its true owner.

I am willing to accept the first premise because the probate judge found that the decedent had possession at the time of his death and the trial court accepted all his findings,[3] except the finding in which the probate judge found that the decedent did not participate in the theft. The second premise—the rebuttable presumption

---

[1] The finder's fee in this case was in essence a reward paid by the owner for the return of its stolen property.

[2] After payment of the insurance proceeds to Bronislaw Huberman, the person from whom the Stradivarius was stolen, Lloyd's succeeded to his interest in the violin.

[3] Although I accept this finding, the trial court's memorandum of decision sets forth numerous facts that indicate that the plaintiff came into possession of the violin *before* the death of the decedent when he directed her to retrieve the violin from the Danbury Symphony Orchestra. The recitation of facts in this dissent demonstrates this point.

of ownership—however, is not relevant in this case. In order to place this issue in its proper context, I review and summarize the trial court's findings.

The plaintiff's testimony before the trial court revealed the following facts, which the trial court stated had "the ring, in most part, of irrefutable truth." The decedent and the plaintiff lived together for many years. The decedent was incarcerated at the Litchfield County correctional facility after having been convicted of sexually abusing the plaintiff's grandchild. While he was incarcerated, the plaintiff and the decedent were married. The decedent, while serving his sentence, was hospitalized because of his failing health, having been diagnosed with stomach cancer in 1985. The plaintiff, while visiting the decedent in the hospital on several different occasions in 1985, had conversations[4] with him regarding the violin he used for more than fifty years as a professional musician. On August 12, 1985, the decedent died while still incarcerated.

During one such visit to the hospital, the decedent asked the plaintiff to retrieve his violin from a member of the Danbury Symphony Orchestra and instructed her to open the violin's case to locate and examine the materials between the outer shell of the violin case and the canvas cover. She acceded to his request and, in the violin case, found several documents, including several newspaper clippings from 1936. The newspaper clippings were from the New York Times, the New York Evening Post and the New York Herald Tribune, and all of the articles focused on the theft of a valuable Stradivarius violin, known as the Gibson, from Carnegie

---

[4] The declarations that the decedent made to the plaintiff were admissible under an exception to the hearsay rule. General Statutes § 52-172 provides in pertinent part: "Declarations and memoranda of deceased persons. In actions by or against the representatives of deceased persons . . . the entries, memoranda and declarations of the deceased, relevant to the matter in issue, may be received as evidence. . . ."

Hall in 1936. In addition, the plaintiff found with those newspaper clippings a September, 1977 edition of The Strad, a monthly journal for amateurs and professionals of stringed instruments played with a bow. One article in the journal was highlighted in pink, and focused on the 1936 theft of the same Stradivarius violin, which, ironically, the article noted, had been stolen previously in 1919 by a thief who was apprehended and the violin was returned to the owner. After perusing these materials, the plaintiff returned to the hospital to confront the decedent about the contents of the articles.

The plaintiff testified that the decedent told her at first that a friend had shown him the stolen violin and ultimately left it with the decedent in order to see if he could sell it for the friend. The plaintiff testified that she asked the decedent what his friend who stole the violin looked like. The decedent described the physical features of his friend and then offered that his friend was "a devil with the ladies," a gambler and an occasional pickpocket at Grand Central Station when he was short of money. The plaintiff told the decedent that it sounded like he was describing himself, and he ultimately said that she was right and began to tell her the "secrets of [his] violin." It took several subsequent trips to the hospital to learn the entire story.

The decedent revealed to the plaintiff in detail the cunning scheme to steal a valuable violin. The decedent and his mother had conspired to steal a violin because she always aspired to get the decedent the kind of violin she thought he needed for his career. They planned to steal a violin from a violinist who had two violins and who did not live in the United States—their reasoning, based on his mother's idea, was that a violinist in this situation would not stay in the area for an inordinate amount of time in order to retrieve the stolen violin. The decedent told the plaintiff that he and his mother, always over tea, would review the then current newspa-

pers and conduct background research in order to determine when an unsuspecting target fit their profile. He said that his mother moved them close to Carnegie Hall and Steinway Hall in order to accomplish this theft. In 1936, at a time when the decedent worked at the Russian Bear,[5] they found their prey when they discovered that Bronislaw Huberman, who had two violins and resided outside of the United States, was scheduled to play at Carnegie Hall.

In order to carry out the scheme, on the day of the theft, the decedent asked his employer at the Russian Bear to excuse him from work because he needed to go home in order to take medicine for his stomach pains. He then went to Carnegie Hall, where he was known because he played in one of the youth symphonies. He gave the guard a Havana cigar and suggested that the guard leave to smoke the cigar while the decedent stood at the guard's post. After the guard left, the decedent went upstairs to Huberman's dressing room and, while Huberman was on stage with the orchestra playing his other violin, the decedent placed the Stradivarius under his coat. After leaving the dressing room with the violin concealed, he watched the remainder of the performance standing next to Huberman's assistant. The decedent then left Carnegie Hall and took a taxicab home, where his mother was waiting. His mother gave him the keys to his locked bedroom and, after he placed the stolen violin on his bed, she gave him the medicine for his stomach pains. He then returned to work at the Russian Bear.

After the decedent's death, the plaintiff negotiated, through her attorney, with Lloyd's for the return of the violin. The plaintiff never revealed to Lloyd's that the

---

[5] The trial court indicated that the Russian Bear was a restaurant where the decedent, as a young man, regularly played as a violinist in a gypsy orchestra. The Russian Bear was located in the back of the Carnegie Hall building in Manhattan.

decedent had stolen the violin himself, but told Lloyd's that he had purchased it from a friend who had stolen the Stradivarius. The violin was returned, and in 1988, after it was sold for $1,200,000, the plaintiff received a finder's fee in the amount of $263,475.75.[6]

The majority indicates that the trial court made no specific finding that the decedent stole the violin. This conclusion, however, ignores the trial court's extensive memorandum of decision and the premise for its decision that the first thief had superior rights to the stolen property over the second thief. The trial court stated the basis of its decision in the following manner: "[T]he elemental proposition that governs this matter . . . [is that] the first thief prevails in an action against subsequent pilferers." The memorandum referred to the decedent as the first thief and characterized the plaintiff as the second thief who stole the violin from the estate. More importantly, the majority's conclusion ignores footnote 2 of the trial court's memorandum of decision, wherein the court specifically rejected the Probate Court's finding that the decedent took the secrets about the violin to his grave because, "[a]t the time of the decision in the Bethel Probate Court, there was apparently no evidence as to [the decedent's] participation in the theft of the Gibson." The trial court clearly indicated, reading footnote 2 as a whole,[7] that the decedent

---

[6] The finder's fee was 25 percent of the sale price that Lloyd's received less certain expenses.

[7] The trial court stated, in the text of its memorandum of decision, that "[b]ased upon the evidence, this court adopts [the] factual findings [of the Probate Court] and will supplement them at appropriate intervals to reflect the fascinating testimony at trial."

Then, in footnote 2 of its memorandum of decision, the trial court stated: *"The court, however, does not adopt one particular set of findings on the second page of the Probate Court's memorandum of decision.* At the time of the decision in the Bethel Probate Court there was apparently no evidence as to [the decedent's] participation in the theft of the Gibson. Thus, the Probate Court found that [the decedent] took the secret with him to the grave. *During the trial of this matter, however, [the plaintiff] testified to*

participated in "the planning and execution of the theft of the [violin]." The trial court also concluded, after reciting the intricate testimony given by the plaintiff, that "[a]s evidenced by the deathbed recitals to [the plaintiff], [the decedent's] whole life was a fraud. . . . On his deathbed, after a life of silence, however, [the decedent] was finally redeemed by revealing his innermost secret of the violin."

Nevertheless, whether the decedent himself stole the violin or it was stolen by a third party and he obtained possession with knowledge, one thing is absolutely certain—he had no interest in the violin and it was not an asset of the estate to be included in the inventory. There is no rebuttable presumption of ownership from possession of stolen property belonging to a known owner[8] —the presumption simply does not arise. The same legal treatise the majority cites to support its reasoning also makes clear the limitation of this principle: "The presumption of ownership from possession is true only where the character of the possession is *wholly unex-*

*[the decedent's] recitation, from his deathbed, in exact detail, of the planning and execution of the theft of the [Stradivarius].*" (Emphasis added.)

[8] The trial court found that the true owner of the Stradivarius was Lloyd's. The trial court, sitting as the Probate Court on appeal; see *Kerin* v. *Stangle*, 209 Conn. 260, 264, 550 A.2d 1069 (1988); indicated, at the very beginning of its memorandum of decision, that "[t]his matter is before the court on an appeal from the Bethel Probate Court . . . arising out of the Probate Court's rejection of an interim accounting, prepared by [the plaintiff], which failed to include a $263,475.75 'finder's fee' received by [the plaintiff] for returning the Gibson Stradivarius violin to its *rightful owner*, [Lloyd's]." (Emphasis added.) Pursuant to General Statutes § 45a-98 (a) (3), the trial court, sitting as the Probate Court on appeal, had clear authority to determine title to property.

General Statutes § 45a-98 provides in pertinent part: "General powers. (a) Courts of probate in their respective districts shall have the power to . . . (3) . . . determine title or rights of possession and use in and to any real, tangible or intangible property that constitutes, or may constitute . . . any decedent's estate . . . otherwise subject to the jurisdiction of the probate court, including the rights and obligations of any beneficiary of the . . . estate . . . ."

*plained . . . . Presumptions concerning title are never allowable against ascertained and established facts. Thus, a presumption of ownership from possession is not allowable against ascertained and established facts to the contrary.*"[9] (Emphasis added.) 73 C.J.S. 237, Property § 36 (b) (1983); see also *Smith* v. *Armstrong*, 118 Mont. 290, 294, 166 P.2d 793 (1946) (referring to presumption of ownership from possession and stating that "[s]uch presumptions are not allowable against ascertained and established facts"); *Hopkins* v. *Heywood*, 86 Vt. 486, 490, 86 A. 305 (1913) (referring to presumption of ownership from possession and stating that "presumptions [cannot] be indulged in concerning the title, for presumptions are never allowed against ascertained and established facts"). Indeed, the parties do not dispute, and the trial court found, that Lloyd's was the rightful owner of the violin. Therefore, the majority's foundational premise that there is a presumption of ownership from possession is inapposite to the present situation because of the undisputed facts that the violin was stolen and belonged to Lloyd's.

Under the circumstances of this case, without the aid of the presumption, neither the violin nor any find-

[9] The majority, in footnote 12 of its opinion, responds to this dissent by citing to authority for the proposition that "the presumption of ownership arising from possession may not be rebutted by evidence that the property was in a third person, when offered as a defense by one who claims no title and is a wrongdoer." 73 C.J.S. 237, Property § 36 (b) (1983). On the basis of that proposition, the majority indicates that the plaintiff was not entitled to rebut the presumption of ownership. This reasoning, however, misses my point. The majority ignores that part of the rule that there is no presumption "allowable against ascertained and established facts to the contrary." Id. It was a known fact before the trial court, and upon which all the parties agreed, that the violin rightfully belonged to Lloyd's, and was, in fact, returned to Lloyd's. Because the starting point of the trial court's decision in this case was that the violin was returned to its rightful owner, the presumption *never became operative* in the first instance. Simply put, there was no presumption to rebut.

er's fee that flowed from its return should have been listed in the inventory of the estate because the decedent—the thief—had no interest in the violin at the time of his death. It is well settled that the fiduciary, on behalf of the estate, steps into the shoes of the decedent as of the date of his death, with respect to title to the estate property. See *Lynch* v. *Skelly*, 138 Conn. 376, 379, 85 A.2d 251 (1951) ("[i]t is basic in our probate law that the legal title to the personal property of a decedent . . . vests in his administrator or executor").

"It is the duty of the fiduciary to inventory all of the 'assets' of the deceased." G. Wilhelm, Settlement of Estates in Connecticut (2d Ed. 1996) c. 4, § 4:24, p. 4-6. The estate has no greater interest in the personal property of the decedent than the decedent had, because "the law places the executor or administrator in *direct succession* to the deceased and vests in the fiduciary title to the deceased's personal estate." (Emphasis added.) Id., c. 7, § 7:3, p. 1. "If goods, money, or securities belonging to another person lie amongst the goods of the deceased, capable of identification, and they come altogether to the hands of the personal representative, such other person's things are not to be reckoned among assets of the estate." J. Schouler, Law of Executors and Administrators (3d Ed. 1901) § 205, p. 290; see *Cooper* v. *White*, 19 Ga. 554, 556 (1856); see also *Hartwig* v. *Flynn*, 79 Kan. 595, 600, 100 P. 642 (1909) ("It is not perceived how the [fiduciary] could, consistently with the claims of adverse ownership, make an unqualified return that [this personal property] belonged to the estate. An inventory must be verified as just and true . . . and [a fiduciary] who believes that property belongs [to someone else] should not be compelled to swear that it is the property of the estate." [Citation omitted.]); G. Newhall, Settlement of Estates and Fiduciary Law in Massachusetts (3d Ed. 1937) § 69,

p. 160 ("the goods of any third person which were in the decedent's possession at the time of his death are not assets, but continue to be the goods of such third person, if they can be traced" specifically); *Chase* v. *Chase*, 271 Mass. 485, 492, 171 N.E. 651 (1930) (real property of married woman not subject to be included in estate of decedent husband); *Patterson* v. *Pendexter*, 259 Mass. 490, 494, 156 N.E. 687 (1927) (bonds belonging to father of decedent). In fact, as noted by the majority, the plaintiff, after the death of the decedent, obtained verification that the instrument was indeed the "long lost Gibson."

I find it extremely difficult to accept that the decedent's estate has any interest in property stolen by the decedent or derived from property stolen by the decedent.[10] The only conclusion that can be drawn from the majority today is that the decedent thief had an inchoate interest in the property he had stolen, to the extent of a reward paid by its true owner for its return.[11] That cannot be the law—indeed, such a proposition would clearly be against public policy.[12] Simply put, a thief

[10] The majority states that the fiduciary of the estate of a decedent has a fiduciary duty to the estate and must be loyal to his or her trust. I agree, but I do not see what this has to do with property that was in the *possession of the decedent that was stolen by the decedent.* The majority fails to explain this. There simply is no duty owed with respect to property stolen by the decedent and owned by a third party.

[11] Furthermore, even if we assume that there was a dispute about the ownership of the violin, or that somehow the presumption of ownership was relevant, I find it difficult, on the basis of the majority's analysis, to come to the conclusion that the finder's fee should have been included in the inventory. It would seem to follow logically, under those circumstances, that rather than the finder's fee, the value of the violin should have been included in the inventory. The majority, without any explanation, substitutes the finder's fee for that of the violin.

[12] General Statutes § 52-564 provides: "Treble damages for theft. Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages."

General Statutes § 53a-119 provides in pertinent part: "A person commits larceny when, with intent to deprive another of property or to appropriate

can have no interest in the property that he or she has stolen and his or her estate cannot derive any gain from that property. Therefore, upon the decedent's death, there was no interest to which the estate could succeed.

Any reward for the return of the property is a matter between the owner and the person who returned it. Any misrepresentations made by the plaintiff to Lloyd's with respect to how the decedent may have obtained possession of the property, which induced Lloyd's to pay the plaintiff a reward for its return,[13] is not an issue in this case.

I respectfully dissent.

the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

[13] The trial court found that the plaintiff misrepresented how the decedent came into possession of the violin. The trial court stated: "In connection with the Gibson being turned over to Lloyd's, [the plaintiff] never revealed her knowledge that [the decedent] had, himself, stolen the [Stradivarius]. Rather, she stuck by the story that [the decedent's] 'buddy' had stolen the [violin] from Huberman at Carnegie Hall and sold it to [the decedent] in the Russian Bear for $100. In 1987, [the plaintiff] gave an interview to People magazine and did not indicate that [the decedent] had stolen the Gibson. The reason for not revealing what she came to know as the truth was that [the decedent's] sister, Sylvia, was quite ill and 'poverty-stricken.' 'Her beautiful Steinway piano was going through the floorboards of her house. I had a great deal of compassion for her. She had a terrible life with her mother and her brother. And now she had to realize that her brother was going to jail for sexually abusing my granddaughter. That was almost too much for her to bear, and I could not put on her shoulders the fact that her mother, who she loved, as most of us do of our mothers, was a crook.' "