[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION FOR CONTEMPT
The court will give a brief recitation of the facts which will be reviewed in more detail during the decision as it becomes necessary. The parties were never married, but had a child and for a time lived together in the plaintiffs house. A custody and visitation complaint was filed by the plaintiff seeking custody of the minor child. The defendant claims to have left various articles of furniture, a dishwasher, a machine she used in her profession as a jeweler, clothing, a rug, Barbie dolls belonging to her daughter, and allegedly antique plates that had belonged to her grandmother in the plaintiffs house at the time she left the residence.
On September 22, 1997, the parties filed an agreement which was adopted by the court as an order five days later. In this agreement, the defendant listed the just-mentioned property that the plaintiff agreed she was entitled to remove. The agreement said that the defendant was to remove this property no later than October 3, 1997. The plaintiff was not to be presentor interfere with the defendant's removal of her property. The defendant appeared at the residence with a moving van as did the plaintiff and the defendant claims she was not able to remove any of the property listed in the September 22nd agreement. The defendant did not attempt to retrieve her property prior to the court entering judgment in the case on May 28, 1999, claiming she was intimidated by the plaintiff. There was a claimed history of domestic violence and, at one point, the defendant entered a battered women's shelter.
Prior to the court entering judgment, the parties submitted proposed orders which covered custody and visitation transportation, holiday arrangements, child support, health insurance and property. Both of the documents referred to the defendant's property set forth in an Attachment A, which in most respects is the same list that was attached to the September 22, 1997 agreement. The defendant demanded the property be returned to her within thirty days in her May 12, 1999 proposed orders; the plaintiff agreed to this in his Proposed Order. CT Page 832
The court issued its judgment May 28, 1999 and, among other things, stated that "the parties were never married and live separate and apart pursuant to Conn. Gen. Stat. § 46b-61 No mention was made in the judgment concerning the property and the defendant filed a motion for clarification/articulation post judgment" in which she requested that the judge who heard the matter clarify his decision as to the defendant's property by ordering the plaintiff to return the previously-mentioned property within thirty days. The court did so on August "23 1999 and ordered that the property be returned. When the defendant went to the plaintiffs residence to retrieve her property, only the washer and dryer could be found. On September 17, 1999, the defendant filed a motion for contempt claiming the plaintiff violated an order of the court as to her property.
The defendant now asks for a monetary award compensating her for the value of her property that was improperly disposed of by the plaintiff in violation of what is claimed to be an operative and valid court order. If the court has the jurisdiction to do so, this would be a proper exercise of contempt power since a court has the inherent authority to "protect the integrity of its original judgment," Commissioner of Mental HealthServices v. Youth Challenge of Greater Hartford, 191 Conn. 555, 563
(1983), and, more to the point, "In a contempt proceeding, even in the absence of a finding of contempt, a trial court has broad discretion to make whole a party's failure to comply with the court order," Kronholmv. Kronholm, 23 Conn. App. 577, 579 (1990), cf. Clement v. Clement,34 Conn. App. 641, 646 (1994). Furthermore, if in the civil contempt context, a "compensatory fine" can be imposed to reflect the actual damage suffered by the injured party as a result of a violation of a court order such as an injunction, DeMartino v. Monroe Little League,Inc., 192 Conn. 271, 279 (1984), it is difficult to understand how the same type of remedy cannot be imposed where a family court imposes an order regarding property that has been destroyed.
 (a)
But the power of this court to give the relief requested pursuant to the motion for contempt is predicated on the existence of subject matter jurisdiction in Superior Court to have issued any order regarding the defendant's property in the first place. The defendant makes some general observations regarding the possible lack of subject matter jurisdiction saying such an argument cannot be raised at this point since the plaintiff "failed to raise the issue before the court and the court order was, after all, the result of an agreement between the parties" and the defendant also states that "the proper method to attack a court's lack of CT Page 833 subject matter jurisdiction would be via a motion to dismiss which the plaintiff has also failed to file."
 The Supreme Court's response to arguments such as this has been clear. "It is hornbook law that the parties cannot confer subject matter jurisdiction on a court by consent, waiver, silence or agreement," Hayes v. Bereford, 184 Conn. 558, 562 (1981).
The court expanded on this in a later opinion which suggested even an appellate court can raise the issue of subject matter jurisdiction.
 "This court has often stated that the question of subject matter jurisdiction, because it addresses the basic competency of the court, can be raised by any of the parties, or by the court sua sponte at any time . . . the court has a duty to dismiss, even on its own initiative, any appeal that it lacks jurisdiction to hear. . . . Morever, the parties cannot confer subject matter jurisdiction on the court, either by waiver or consent," Webster Bank v. Zak, 259 Conn. 774, 776 (2002), (internal quotation marks and citations omitted) (also see Practice Book § 10-33).
The first question then to be asked is whether the court had subject matter jurisdiction to issue orders concerning the defendant's personal property in this custody dispute between unmarried parties. An examination of the statutory scheme is necessary. Section 46b-1 suggests in general language that the Superior Court has jurisdiction over matters involving custody of children. The only specifically operative statute in a case such as this involving unmarried parents is § 46b-61, see Stevens v.Leone, 35 Conn. Sup. 237, 240 (1979). The statute reads as follows:
 "In all cases in which the parents of a minor child live separately, the superior court for the judicial district where the parties or one of them resides may, on the application of either party and after notice given to the other, make any order as to the custody, care, education, visitation and support of any minor child of the parties, subject to the provisions of sections 46b-54, 46b-56, 46b-57 and 46b-66. Proceedings to obtain such orders shall be commenced by service of an application, a summons and an order to show case."
There is not a word, of course, in the statute about the power of the court to issue orders regarding the parents' claims to property ancillary to any custody determination under the statute why should there be, what would such matters have to do with the custody and welfare of the child?
In ordinary dissolution actions, the legislature knew quite well how to CT Page 834 use the necessary language to give courts jurisdiction to make orders and judgments regarding property. Section 46b-51 states that "in any action for dissolution of marriage or legal separation," the court can make a finding that "a marriage breakdown has occurred where both parties are both before the court and stipulate to the breakdown and have submitted an agreement covering, among other matters, custody of children and "the disposition of property."
Section 46b-66, although referenced in § 46b-61, states that "in any case under this chapter" where parties have submitted the type of agreement just referred to in § 46b-51, which as noted can reference the disposition of property, the court can ensure the agreement becomes part of the file and incorporate in the decree if the agreement is in writing and. the court finds it to be fair. But to determine if it is fair, the court shall inquire "into the financial resources and actualneeds of the spouses and their respective fitness to have physical custody of or rights of visitation with any minor child. . . ." (Emphasis by court.)
Section 46b-66a provides that the Superior Court can order the "husband or wife" to convey their title to real property to the other party or a third person and this shall be done "at the time of entering a decree annulling or dissolving a marriage or for legal separation. " Also see § 46b-81 which in subsection (a) states:
 "(a) At the time of entering a decree annulling or dissolving a marriage or for legal separation pursuant to a complaint under section 46b-45, the Superior Court may assign to either the husband or wife all or any part of the estate of the other. The court may pass title to real property to either party or to a third person or may order the sale of such real property, without any act by either the husband or the wife, when in the judgment of the court it is the property mode to carry the decree into effect." (Emphasis added.)
In light of the foregoing, the court concludes that the court that originally handled this matter had no subject matter jurisdiction to enter any order or render any judgment regarding the property of the defendant and the obligation of the plaintiff to return it. There is no authority in the statutes to permit this in a custody dispute between unmarried parties. This is not even a case where arguably the property at issue had some relationship to the custody, care, education or support of the child. All of the items represented the personal property of the mother, such as items of furniture, a rug, a half-sister's dolls, and a machine used by the defendant mother in her profession. CT Page 835
 (b)
But the fact that the court has concluded the court handling this matter had no subject matter jurisdiction to enter orders regarding the property of the defendant does not resolve the issue of whether the court should consider the matter on the merits. The whole question of finality of judgments is raised and the issue of whether when an order or judgment is entered in a contested matter parties should be allowed to litigate the issue of subject matter jurisdiction in subsequent litigation arising out of alleged violations of the order or judgment. Important cases areVogel v. Vogel, 178 Conn. 358 (1979); Conn. Pharmaceutical Assn. v.Milano, 191 Conn. 555 (1983); Morris v. Irwin, 4 Conn. App. 431 (1985);Daly v. Daly, 19 Conn. App. 65 (1989); Daley v. Hartford, 215 Conn. 14
(1990); cf. Restatement 2d Judgments, § 12. In Upjohn Co. v. ZoningBoard of Appeals, 224 Conn. 96, 103 (1992), the court quoted from Vogelv. Vogel, 178 Conn. 358 (1979), and said the following:
 . . . we note that there are limits to the notion that subject matter jurisdictional defects may be raised at any time. "As we have only recently observed, however, "[t]he modern law of civil procedure suggests that even litigation about subject matter jurisdiction should take into account the importance of the principle of the finality of judgments, particularly when the parties have had a full opportunity originally to tribunal. . . ." Monroe v. Monroe, 177 Conn. 173, 178 . . . Under this rationale, at least where the lack of jurisdiction is not entirely obvious, the critical considerations are whether the complaining party had the opportunity to litigate the question of, jurisdiction in the original action, and, if he did have such an opportunity, whether there are strong policy reasons for giving him a second opportunity to do so' . . ."
The Vogel opinion itself then went on to say:
The plaintiff in this case not only was fully aware of the consequences of the decrees and had the opportunity to fully litigate the question of jurisdiction in the original action, but, by stipulation, agreed without reservation to the terms of the orders which he now challenges'. . . Vogelv. Vogel, 178 Conn. 358, 362-363 . . ." (Also see Morris v. Irwin, supra;Conn. Pharmaceutical Assn. , Inc. v. Milano, supra.) Also cf. Sturgill v.Sturgill, 572 N.E.2d 178, 182 (Conn.App. 1989).
Our case law in this area relies heavily on the Restatement of Judgments Second, § 12, which gives the following assessment of the issues involved in jurisdictional attacks on previous judgment in subsequent litigation. In comment d, the Restatement said the following CT Page 836 at page 122:
 "The interests primarily at stake in resolving this question are governmental and societal, not those of the parties. By hypothesis the parties had earlier opportunity to litigate the question of jurisdiction and thereby to protect their interest in the rules governing competency. They also had their day on the merits, even if before a body whose authority is now in doubt. To allow one of them to raise the question of subject matter jurisdiction after judgment is in effect to make him a public agent for enforcing the rules of jurisdiction. But the public interest, though substantial, also has its protectors in other litigants on other occasions, who will have opportunity and incentive to object to the excess of authority if it is repeated.
 The question therefore is whether the public interest in observance of the particular jurisdictional rule is sufficiently strong to permit a possibly superfluous vindication of the rule by a litigation who is undeserving of the accompanying benefit that will redound to him. The public interest is of that strength only if the tribunal's excess of authority was plain or has seriously disturbed the distribution of governmental powers or has infringed a fundamental constitutional protection. "
The court will now review the facts here in light of the Restatement and the holding in Upjohn. Here, the plaintiff was well aware of the consequences of the agreement he signed in September, 1997 relative to the defendant's property which was made an order of the court. That pendente lite order should be taken to have survived the judgment as originally issued on May 28, 1999 since its subject matter was not mentioned therein. Besides on June 11, 1999, a motion for articulation was filed by defense counsel and served on the plaintiffs lawyer; that stayed the judgment which, in fact, the court modified on August 23, 1999 to include orders as to the defendant's property. The plaintiff appealed none of these orders nor did he raise subject matter jurisdiction, in fact, he invited the court to exercise its jurisdiction relative to entering orders as to the property — all the time, of course, while the statute of limitations was running on any civil action that could have been brought by the defendant on any claim she might have had.
Also to permit this Superior Court order to be enforced would not infringe on the authority of another tribunal or agency to deal with matters of this type. Any civil action filed by the defendant could have been heard in Superior Court. CT Page 837
The difficult question on this finality issue is whether the lack of jurisdiction was plain or obvious (cf. Vogel v. Vogel, supra) — whatever that means. As the Restatement put it in subsection (1) of § 12, subject matter jurisdiction can be litigated if "(1) the subject matter of the action was so plainly beyond the court's jurisdiction that its entertaining the action Was a abuse of authority." (Also see Vogel v. Vogel, supra.) That cannot be said here. The court has previously noted the reference in § 46b-61 (on which the judgment was based) to § 46b-66 which talks about proposed orders from parties that include such orders as to disposition of property despite its language seemingly confining its operation to spouses. Furthermore, a custody action under § 46b-61 is circumscribed by statute but as to such an action the same can be said as was said of a suit for dissolution of a marriage.
 ". . . while an action for divorce or dissolution of marriage is a creature of statute, it is essentially equitable in nature," Stoner v. Stoner, 163 Conn. 345, 356 (1972)."
 . . . The power to act equitably is the keystone to the court's ability to fashion relief in the infinite variety of circumstances which arise out of the dissolution of a marriage . . .," Pasquariello v. Pasquariello, 168 Conn. 579, 585 (1975).
In this regard, a brief examination of the file reveals that the original custody litigation was lengthy and highly acrimonious. While litigation was going on, a restraining order or orders were filed, the judge had to tell the parents not to talk badly about each other in the child's presence. It is not absolutely clear that the judge entering the original judgment had no jurisdiction to enforce a mutual agreement as to property even apart from § 46b-66. What was he to do or find — yes, I have no jurisdiction over this property issue, but while I am in the middle of this custody battle let me encourage you to engage in a wider war as to property claims, let another suit be filed or try to work it out without court assistance and I will not concern myself with the fallout this will have on the child by further embittering relations between the parents? In other words, it is not so plain that a court, in light of factors such as these, would have no jurisdiction to issue an order regarding parental property. In fact, the Restatement is quite elusive in defining what it is meant by saying an action was "plainly beyond the court's jurisdiction. " In the original reporter's note to § 12, it says "cases involving plain excess of jurisdiction are rare," and then cites one case, State ex rel City of Mayfield Heights v.Bartinek, 231 N.E.2d 236 (Oh. App. 1967). There, a court of limited jurisdiction, a probate court, was held to be completely without CT Page 838 jurisdiction to enter a declaratory judgment holding a zoning ordinance was unconstitutional, and it could not therefore entertain a subsequent motion to show cause to enforce its void order, id. p. 232.
The Superior Court that issued orders here is a court of general jurisdiction, which in handling family matters generally often deals with proposed orders regarding disposition of personal property and, where appropriate, issues orders and judgments regarding this matter.
Based on the foregoing, the court concludes it does have jurisdiction to decide the contempt matter on the merits.
 (c)
The court will now discuss the merits of the motion for contempt. The order which was claimed to have been violated was made in response to a June 11, 1999 motion for clarification and articulation directed at the May 28, 1999 judgment and this order concerning the defendant's property was issued on August 23. 1999. The motion for clarification referred to an Attachment A listing the following items:
(a) Secretary
(b) Queen-size bed frame
(c) Marble top dresser
(d) Cypress coffee table
(e) Corner hutch
(f) Area rug (maroon, oriental type)
(g) Curtain rod
(h) Table and six chairs
(i) Dishwasher
(j) Washer and dryer
(k) Krystal's toys
(l) Rolling mill (used in jewelry work) CT Page 839
It should be noted that this list does not include antique plates formerly belonging to the defendant's grandmother. However, in the first list of the defendant's property attached to the parties' agreement when litigation first began in 1997, the plates were mentioned and the agreement became a court order as to items the defendant would be allowed to retrieve from the plaintiffs property. Apparently during the litigation lists of the defendant's property were prepared at various times.
The question before the court now becomes, given the August 23, 1999 court order, I can the plaintiff be held to have violated it and, if so, what is the remedy. The plaintiff was not present in court when the order was issued, but it was communicated to him by counsel. As noted, on September 11, 1999, when the defendant went to retrieve her property she could only locate the washer and dryer. On September 17, 1999, the defendant filed this contempt motion claiming that despite being ordered to return her property, the plaintiff had disposed of it.
The court will discuss the evidence presented in this case in order to decide the merits of this contempt motion. First, it should be said that although the antagonists in this case might be very nice and honest people in their ordinary day-to-day lives, in their dispute with each other the court found it difficult to accept as credible portions of both their testimony. That is not surprising given the acrimonious nature of this litigation since it first was initiated in the late summer of 1997. On the other hand, the court found the testimony of the witnesses presented by each side to be credible.
Certain preliminary matters should be discussed which have been referred to in a slightly different context. As noted, the original September, 1997 agreement which was made a court order required the defendant to pick up her property within thirty days. She did not do so. Implicit in this order was the requirement that the defendant's retrieval of her property could not be interfered with. The plaintiff, however, did appear and the moving van left without completing the removal. The defendant did not thereafter seek to recover her property by turning to the courts or otherwise, but this was a stormy relationship with restraining orders stays the battered shelter. Under these circumstances, it is difficult for the court to accept some form of a laches argument whereby the plaintiff can claim he had a right to have the property destroyed. If he believed court orders were inoperative or not binding because of any failures to act by the defendant, why as late as the spring of 1999 did the plaintiff, through counsel, submit proposed orders which recognized the right of the defendant to get her property back? CT Page 840
Can the plaintiff claim that at the time the property was disposed of or disappeared (his explanation on this is rather confusing), he was not aware of or should not be held to be bound by a court order concerning the property? As discussed, the pendente lite order survived the judgment since the latter did not refer to the property. In any event, a motion for articulation and clarification was filed as to this issue and sent to the plaintiffs lawyer which was notice to him. As will be discussed, the court concludes the property was put in the trash after the motion for articulation and at least one month before August 23, 1999. The plaintiff had no right, under these circumstances, to violate court orders regarding this property and to thwart the court's inherent power to review the correctness of its judgment upon the filing of a motion for articulation.
Can the plaintiff claim that he has no knowledge of what happened to the property or that somehow he was led to believe the defendant did not care if she did not recover it, thus giving him a carte blanche to destroy it?
The plaintiffs explanation of what happened to the property was confusing and contradictory. He said he kept it in a garage until the spring of 1998. He then received a car and moved the furniture along with the rolling mill out into the yard. The property somehow then disappeared. Even if exposing the property to the elements was acceptable, this version of events is contradicted by letters he wrote to the defendant in the summer of 1999. In these letters, he represented the furniture was still in his possession, in fact, implying it was in his house. He demanded a large sum of money for expenses the defendant never reimbursed him for and said he would have the property put in a dumpster and hauled way. That he intentionally had the disputed property carted to the trash dump is further supported by the phone call the court believes he made to the defendant's ex-mother-in-law to the effect that the defendant won the first round by the awarding of custody in the May 28, 1999 judgment. "Now let's see if you're going to get your furniture."
In summary, the plaintiff had difficulty in adopting a consistent position as to this property, at one point even indicating the defendant was serious in suggesting that he could keep the property (with expletives deleted). If she said it, the plaintiff could not have taken her seriously — witness his submission through counsel his submission of proposed orders in the spring of 1999, the mother-in-law conversation and the summer of 1999 letters to the defendant all of which indicated that he was well aware of the fact that the defendant wanted her property and that the property was, in fact, still available in the CT Page 841 spring and summer of 1999.
But the question remains what property, what was the value of that property and did the defendant in fact retrieve some of the property she now claims she never recovered? In regards to all these questions, as previously noted, the court found the defendant's testimony, just like portions of the plaintiffs testimony, not very credible.
The defendant makes a claim that antique plates given to her by her grandmother were missing and presumably thrown out by the plaintiff when she went to the property in September, 1999 pursuant to the court order.
But, interestingly, although the list attached to the September, 1997 agreement refers to the plates, the proposed orders submitted to the court by her counsel in the spring of 1999 did not mention the plates. No adequate reason was offered for the discrepancy, somehow it was a mistake — a position the court finds it hard to accept given the nature of this case. The plaintiff said he never saw the plates in the three years he lived with the defendant and more convincing to the court is the testimony of the plaintiffs mother, Ruby Lord, to the effect that she had never seen these antique plates on the premises.
The defendant also testified that when she went to examine the premises in September of 1997, she saw no Barbie dolls. The plaintiff, in none of his communications with the ex-mother-in-law or in the summer 1999 letters to the defendant, refers to the dolls, and it is difficult to understand why he would hold the threat of the destruction of the furniture over the defendant's head but not mention the Barbie doll collection of the defendant's daughter which is the single most valuable item claimed. In September, 1997, when the defendant went to retrieve her property, the court, as indicated, has concluded that she was in part thwarted in this endeavor. But after the plaintiff was removed from the property the defendant was observed by his brother to make three trips to the property in her pick up truck which had a seven-foot bed. He said that he saw the defendant put five-foot boxes in the truck which could very well have contained the dolls. The defendant's response was to not deny that she made these trips with her truck, but to say she only removed essentials, i.e. clothing. Twenty-two boxes were loaded on the van which had to leave without getting the furniture. It strains credulity to believe that this lady for herself and two minor children had to make three trips with her pickup truck just to get clothing and at the same time left behind her child's Barbie doll collection worth $3,500.
The court will now discuss the other items of property, which it CT Page 842 concludes the plaintiff had destroyed and the value of the property. The court concludes that the following items were improperly disposed of by the plaintiff:
(a) Secretary
(b) Bed frame
(c) Marble top dresser
(d) Cypress coffee table
(e) Corner hutch
(f) Area rug
(g) Table and six chairs
(h) Washer and dryer
(i) Rolling mill
(j) Dishwasher
The court will now discuss the value of each item of property.
In State v. Barker, 182 Conn. 52 (1980), the court said: "Our cases have ruled that the competence of the witness to testify to the value of property may be established by demonstrating that the witness owns the property in question. " The rule in part is based upon "the common experience that an owner is familiar with her property and knows what it is worth," and "the rule is applicable to in criminal as well as civil cases," id. pp. 60-61. The weight given to any such testimony is for the court to decide, cf. Westport Taxi Service v. Westport Transit District,235 Conn. 35 (1995); Moore v. Sergi, 38 Conn. App. 829: "An owner's opinion as to the value of his (her) property goes to the weight of the testimony and not to its admissibility," id. p. 840.;
The rolling mill was used by the defendant in a trade which she practiced. The court assigns a value of the rolling mill of $1,500 based on the defendant's testimony. Because of her work in the making of jewelry the defendant was certainly competent to make this valuation.
The court accepts the value of the washer and dryer at $300; the plaintiff said the timer was broken, but the defendant used the items CT Page 843 regularly. The court also accepts the $300 value placed on the dishwasher; there was no evidence presented to contradict the defendant's monetary value, there was merely testimony from the plaintiff as to this item's damaged physical condition, but the court concludes that is probably due to the way the item was kept after the defendant left the residence.
The remaining items are furniture (a secretary, a corner hutch, a marble top dresser, a table and six chairs) and an oriental rug, red in color. The court finds it hard to believe the plaintiffs testimony that the table and chairs belonged to him and not to the defendant, as is claimed by her. The original September 22, 1997 agreement signed by both parties and made a court order had attached to it a list of what apparently was the property claimed by the defendant as did the proposed order submitted by her in May of 1999.
Both listed the table and chairs. And in his May, 1999 proposed orders, the plaintiff referred to Attachment A appended to the defendant's proposed orders which listed the table and chairs and indicated he agreed that the defendant could retrieve these items. Also, why did the plaintiff feel compelled to take pictures of the table and chairs for use in litigation, along with all the other furniture in order to establish the bad physical condition all of these items were in, if the table and chairs also did not belong to the defendant?
The valuation of the various items of furniture is particularly difficult since the stories of each of the antagonists is so contradictory and their views are not supported by independent testimony. An example of the difficulties are the pictures of the various pieces of furniture presented by the plaintiff along with his fairly detailed testimony about the type and location of damage to the various pieces. It is difficult to see the damage in the pictures. Also, the plaintiff claims, for example, that as to the secretary, "there's a whole piece missing off the side of it from when it was moved out of her mother's house," yet his photo of that piece did not show the side that was damaged — all he could say is that he thought he had taken such a photo. On the other hand, although these items were in use for several years, the defendant never responded to the plaintiffs allegations of specific damage to various pieces of furniture or wear caused by use of the furniture and the rug.
The court will now review each item. The plaintiff said the cherry wood secretary was worth $2,000; her former husband paid $3,500 for it. The reduction in value could be accounted for by the condition the plaintiff said it was in. The plaintiff said, however, that the defendant's CT Page 844 ex-husband removed this piece from an auction site and when asked whether it was paid for, responded: "I don't believe so." This elusive testimony hints that it was perhaps stolen but a party in possession is regarded as the owner at common law except in a contest with the true owner. Hall v. Schoenwerter, 239 Conn. 553, 563 (1996). More to the point, the plaintiff just says he does not believe the secretary was paid for, but he gives no basis on which he can arrive at anything approaching a conclusive opinion. The court will assign a $2,000 value to this item.
The marble top dresser was valued by the plaintiff at $1,000. It was from her mother-in-law and she traded a bedroom set for the dresser. She said her mother-in-law paid $3,500 for the dresser because she saw the price tag. The court accepts the valuation of $1,000.
As to the oriental rug, the defendant placed the same value on it as when she purchased it in 1992 — $700. The plaintiff testified the rug had several years of wear on it. In addition, he testified that when she left his residence, the defendant abandoned her dog who urinated all over this oriental area rug. It's hard to accept the defendant's valuation of the rug given this testimony. This is especially so in light of the fact that if the rug was so valuable, there is no apparent reason why the defendant could not have removed it in one of her three forays with the pick up truck in September, 1997. The court will ascribe a nominal value of $50 for the rug. The defendant never denied that she left the dog in the house and there is no reason to blame the plaintiff for refusing to store a rug in this condition in an enclosed area.
The plaintiff testified the replacement value of the corner hutch was $500, but then later gave it a value of $250. That does not appear to be unreasonable since she claims to have paid $500 for it in North Carolina.
The court has a great deal of difficulty in accepting the $1,800 value put by the defendant on the cypress coffee table. Even if it was given to her, as the plaintiff claims, that would not necessarily affect the defendant's valuation although it can go to the weight. What the court found disquieting is the defendant's claim that the defendant's brother put an $1,800 value on this table; he is a furniture maker. The court found Thomas Lord to be a credible witness. He testified the defendant told him a trading post put a $20 value on the table and far from telling her it was worth $1,800, he said he could not put a value on the piece since he did not make that kind of furniture. The court places a nominal value of $50 on this furniture.
The court, however, does accept the defendant's valuation of $1,000 on CT Page 845 the table and six chairs.
The court concludes that the defendant was in contempt and the total amount of compensatory relief should be in the amount of $6,450.
The request for attorney's fees by defendant's counsel seems reasonable, but before it can be awarded, an updated affidavit should be filed listing the hours spent for each of the hearings. The present affidavits do not list all the hearing dates. The court will also award transcript costs in the amount of $446.14 as requested, but will award $750 for the post-trial brief.[1]
 ___________________ Corradino, J.
 1-13-03